# Exhibit 15

Post

**Attorney General Pamela Bondi**
@AGPamBondi

UPDATE:

William Kelly is now in custody.

Our nation was settled and founded by people fleeing religious persecution. Religious freedom is the bedrock of this country.

We will protect our pastors. We will protect our churches. We will protect Americans of faith.

1:07 PM · Jan 22, 2026 · **2.4M** Views

Read 5.3K replies

**New to X?**

Sign up with Google

Sign up with Apple

Create account

**Relevant people**

**Attorney Genera...** @AGPamBondi Follow
87th Attorney General serving under the leadership of @POTUS Trump

**What's happening**

Business and finance · Trending
**SASE**

Trending in United States
**Mayor Giuliani**

Trending in United States
**May the 4th**

Trending in United States
**Okarun**

Show more

**Don't miss what's happening**
People on X are the first to know.

Log in Sign up

# Exhibit 16

An official website of the United States government Here's how you know

Countdown to America's 250th Anniversary! 60 Days 11 Hours 20 Minutes

Homeland Security

Topics News In Focus How Do I? Get Involved About DHS

Home » News » Press Releases » DHS Arrests 3 Ringleaders of St. Paul Church Riot for Federal Crimes

News
All DHS News
Apps
Blog
Comunicados de Prensa
Data
Events
Featured News
Homeland Security LIVE
Media Contacts
Media Library
National Terrorism Advisory System
Press Releases
Subscribe

# DHS Arrests 3 Ringleaders of St. Paul Church Riot for Federal Crimes

**Release Date:** January 23, 2026

*The suspects face federal charges for their attack on churchgoers' religious freedom*

WASHINGTON – The Department of Homeland Security (DHS) on Thursday joined the Department of Justice in arresting three individuals in connection with a planned riot at a church in St. Paul, Minnesota on Sunday.

On Sunday, January 18, anti-Immigration and Customs Enforcement (ICE) agitators stormed into the Cities Church in St. Paul, shouting down churchgoers in the middle of services. Protestors targeted the church accusing one of the pastors of working for ICE.

On Thursday, Homeland Security Investigators (HSI) – alongside FBI partners – arrested Nekima Levy Armstrong, Chauntyll Louisa Allen, and William Kelly in connection with Sunday's riot. The three are being charged under 18 USC 241.

Title 18, U.S.C., Section 241 makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same).

*"Religious freedom is the bedrock of the United States - there is no first amendment right to obstruct someone from practicing their religion,"* said **Secretary Kristi Noem**.



Homeland Security

Chauntyll Louisa Allen has been charged with conspiracy to deprive rights for her role in the St. Paul church riots.




Secretary Kristi Noem

William Kelly is being charged with conspiracy to deprive rights, a federal crime, and violating the FACE act 18 USC 248 for his involvement in the St. Paul church riots.



ICE, and other federal immigration law enforcement, have arrested more than 10,000 illegal aliens in Minnesota since January 20, 2025. In response to that robust enforcement of law and order, leftist agitators have attacked, organized riots, and attempted to thwart law enforcement daily. Even as they face a 1,300% increase in assaults against them, a 3,200% increase in vehicular attacks against them, and an 8,000% increase in death threats against them, the brave men and women of ICE will not be deterred.

###

Topics

HOMELAND SECURITY ENTERPRISE IMMIGRATION AND CUSTOMS ENFORCEMENT

Keywords

CRIME HOMELAND SECURITY INVESTIGATIONS (HSI) IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE)

Last Updated: 01/23/2026

Was this page helpful?

Yes No

Submit

Topics News In Focus How Do I? Get Involved About DHS

Homeland Security

DHS.gov
An official website of the U.S. Department of Homeland Security

About DHS
Accessibility
Budget and Performance
DHS Components
FOIA Requests
No FEAR Act Data
Privacy Policy
Site Links
Vulnerability Disclosure Program
Office of Inspector General
The White House
USA.gov

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM
NO CURRENT ADVISORIES

# Exhibit 17

X

Post

**Attorney General Pamela Bondi**
@AGPamBondi

At my direction, early this morning federal agents arrested Don Lemon, Trahern Jeen Crews, Georgia Fort, and Jamael Lydell Lundy, in connection with the coordinated attack on Cities Church in St. Paul, Minnesota.

More details soon.

9:09 AM · Jan 30, 2026 · **11M** Views

2.4K

Read 18.1K replies

**New to X?**

Sign up with Google

Sign up with Apple

Create account

**Relevant people**

Attorney Genera... @AGPamBondi — Follow

87th Attorney General serving under the leadership of Trump

**What's happening**

Trending in United States
**Mayor Giuliani**

**SASE**

Sports · Trending
**John Sterling**

Sports · Trending
**Hailey Van Lith**

**Don't miss what's happening**
People on X are the first to know.

Log in
Sign up

# Exhibit 18

X

← **Post**

**Attorney General Pamela Bondi**
@AGPamBondi

If you riot in a place of worship, we WILL find you.

We have made two more arrests in connection with the coordinated attack on Cities Church in St. Paul, Minnesota: Ian Davis Austin and Jerome Deangelo Richardson.

9:10 AM · Feb 2, 2026 · **1.3M** Views

7.2K 4.9K 32K 295

**Read 7.2K replies**

**New to X?**

Sign up with Google

Sign up with Apple

**Create account**

**Relevant people**

**Attorney Genera...** @AGPamBondi **Follow**
87th Attorney General serving under the leadership of @POTUS Trump

**What's happening**

Business and finance · Trending
**SASE**

Trending in United States
**May the 4th**

Trending in United States
**Sloot**

Trending in United States
**Okarun**

**Don't miss what's happening**
People on X are the first to know.

Log in Sign up

# Exhibit 19

𝕏

← **Post**

**Attorney General Pamela Bondi**
@AGPamBondi

Today, @thejusticedept unsealed an indictment charging 30 more people who took part in the attack on Cities Church in Minnesota.

At my direction, federal agents have already arrested 25 of them, with more to come throughout the day.

YOU CANNOT ATTACK A HOUSE OF WORSHIP. If you do so, you cannot hide from us — we will find you, arrest you, and prosecute you.

This Department of Justice STANDS for Christians and all Americans of faith. 🇺🇸

1:25 PM · Feb 27, 2026 · **1.6M** Views

Read 6.1K replies


**New to X?**

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.


**Relevant people**

**Attorney Genera...** @AGPamBondi Follow
87th Attorney General serving under the leadership of @POTUS Trump 🇺🇸


**What's happening**

Trending in United States
**Mayor Giuliani**

Business and Finance · Trending
**SASE**

Sports · Trending
**John Sterling**

Sports · Trending
**Hailey Van Lith**

Show more

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More… © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in Sign up

# Exhibit 20

POLITICS · 3 MIN READ

# Judge rejects Justice Department's initial attempt to bring charges against Don Lemon

UPDATED JAN 22, 2026

By Hannah Rabinowitz, Kara Scannell



Don Lemon speaks onstage during Telling the Truth in an Age of Misinformation at the 2025 Blackweek Conference at Spring Studios on October 7, 2025 in New York City. *(Arturo Holmes/Getty Images)*

A federal magistrate judge rejected the Justice Department's initial attempt to bring charges against journalist Don Lemon for appearing alongside protesters who breached a Minnesota church over the weekend, a source told CNN.

"The Attorney General is enraged at the magistrate judge's decision," a person familiar with the matter said. Attorney General Pam Bondi has been on the ground in Minnesota for two days meeting with federal prosecutors from the state.

Lemon, who is a former CNN host who now makes content independently, was with dozens of anti-Immigration and Customs Enforcement protesters as they rushed into **Cities Church** in St. Paul, Minnesota, on Sunday morning, interrupting a church service and leading to tense confrontations, CNN has reported.

Lemon has said that he was present at the demonstration as a journalist and not as a protester. In a video of the episode that he posted on YouTube, Lemon says "I'm just here photographing, I'm not part of the group... I'm a journalist."

It is highly unusual for the Justice Department to attempt to criminally charge a journalist who is actively working – though it is not without precedent. Such charges are heavily scrutinized, and, if approved by a judge, often face extended legal battles over whether the journalist is protected by the First Amendment before the case makes it to trial.

In Lemon's case, Justice Department officials immediately, and publicly, asserted that he would face charges. They said Lemon did not have a right to be on the church's private property, adding that interrupting the service may have impeded in the churchgoers' constitutional rights to express their religion.

"The magistrate's reported actions confirm the nature of Don's First Amendment protected work this weekend in Minnesota as a reporter. It was no different than what he has done for more than 30 years, reporting and covering newsworthy events on the ground and engaging in constitutionally protected activity as a journalist," Lemon's attorney, Abbe Lowell, said in a statement Thursday.

Lowell added that Lemon would "fight any charges vigorously and thoroughly in court," should the DOJ continue to pursue them.

The Department of Justice could always try again to bring charges against

Lemon.

Over the past several weeks, Minneapolis has been the epicenter of unrest over the Trump administration's immigration crackdown after the fatal shooting of a 37-year-old woman by an ICE officer. Tensions between protesters and federal authorities have continued to escalate, with the administration planning to surge federal agents in the city.

The church protesters claimed in Lemon's video that a pastor at **Cities Church in St. Paul**, David Easterwood, appeared to be a top ICE official in the Twin Cities. Once they entered the church, the protesters asked a different pastor leading the service to explain Easterwood's connection to the congregation, **one of the protesters told CNN**.

Videos of the moment shows the pastor who was leading the service repeatedly asking the protesters to leave.

Dozens of protesters can also been seen on video chanting "Justice for Renee Good" and engaging in angry exchanges with members of the congregation.

The Justice Department has arrested at least three people involved in the protests.

*This story was updated with additional information.*

## Up next



CNN video analysis: Gunman raised shotgun as he stormed security at press dinner

7 MIN READ



Musk wanted to settle with OpenAI just days before their courtroom showdown, new filing says

4 MIN READ



Lawmakers accuse Justice Department of rushing SPLC indictment, citing whistleblower reports

2 MIN READ



Here are the candidates who have qualified for CNN's California governor's debate

4 MIN READ



Kentucky man charged in deadly bank robbery after high-speed chase

4 MIN READ



The Supreme Court keeps overturning precedent. It swears that it's not

8 MIN READ

## Most popular

1 Unsettled Kremlin tightens security around Putin amid assassinations and coup fears, intel report says

2 Three cruise ship passengers dead, others ill after suspected hantavirus outbreak. Here's what we know.

3 Fact check: Trump denied he made this remark about Iran. He made it on camera one day earlier

4 Former New York Mayor Rudy Giuliani in critical condition with pneumonia, spokesperson says

5 The obvious solution to the global oil shock finally makes sense

6 Trump's new plan to 'guide' merchant ships through Hormuz leaves many questions unanswered

7 The Bezos of it all: The Met Gala's billionaire moment

8 As Swalwell's public profile grew, more than a dozen women describe how he made them uncomfortable in private

9 Flight data bolsters claim China Eastern plane was deliberately crashed in 2022

10 Inside the complex, secretive business of buying ube, the internet's new favorite food

Search CNN...

US
Crime & Justice
Immigration
Education
Transportation
Race & Identity

World
Africa
Americas
Asia
Australia
China
Europe
India
Middle East
United Kingdom

Politics
Elections 2026
Trump
Facts First
CNN Polls
Redistricting Tracker
Epstein Files

Business
Tech
Media
Calculators
Videos

Markets
Pre-markets
After-Hours
Fear & Greed
Investing
Markets Now
Nightcap

Health
Life, But Better
Fitness
Food
Sleep
Mindfulness
Relationships

CNN Underscored
Electronics
Fashion
Beauty
Health & Fitness
Home
Reviews
Deals
Money
Gifts
Travel
Outdoors
Pets

Entertainment
Movies
Television
Celebrity

Tech
Innovate

Style
Arts
Design
Fashion
Architecture
Luxury
Beauty
Video

Travel
Destinations
Food & Drink
Stay
News
Videos

Sports
NFL
NBA
MLB
WNBA
Golf
Soccer
Tennis
Motorsport
College Sports
Olympics
Bleacher Report

Science
Space
Life
Unearthed

Climate
Solutions
Weather

Weather
Video
Climate

Ukraine-Russia War

Israel-Hamas War

Watch
Featured
Shows & Films

Listen
All There Is with Anderson Cooper

Games
Daily Crossword
Jumble Crossword

About CNN
Subscribe
Photos

Network TV
Clips
CNN Headlines
Shows A-Z
CNN 10
CNN TV Schedule

Chasing Life with Dr. Sanjay Gupta
The Assignment with Audie Cornish
Terms of Service with Clare Duffy
CNN 5 Things
All CNN Podcasts

Photo Shuffle
Sudoblock
Sudoku
5 Things Quiz

Investigations
CNN Profiles
CNN Leadership
CNN Newsletters
Work for CNN

CNN Politics

Watch Listen Subscribe Sign In

FOLLOW CNN POLITICS

DOWNLOAD THE CNN APP

Terms of Use Privacy Policy Manage Cookies Ad Choices Accessibility & CC About Subscribe Newsletters Transcripts Help Center

© 2026 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

# Exhibit 21

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/us-news/law/don-lemon-arrested-over-church-protest-942333ee

U.S. • LAW

# Don Lemon Arrested Over Church Protest

Former CNN anchor said he was covering demonstration over immigration enforcement as member of the media

By C. Ryan Barber Follow , Sadie Gurman Follow and Joseph De Avila Follow

Updated Jan. 30, 2026 9:09 pm ET



Don Lemon spoke to reporters Friday after a hearing in Los Angeles. PATRICK T. FALLON/AFP/GETTY IMAGES

Quick Summary

- Don Lemon, the former CNN anchor, was arrested by federal agents in Los Angeles on charges related to an immigration-enforcement protest that disrupted a church service i...
**View more**

Former CNN anchor Don Lemon was arrested by federal agents in Los Angeles late Thursday on charges related to an immigration-enforcement protest that disrupted a church service in Minnesota.

Lemon, who now works independently, was covering the Grammy Awards when federal agents took him into custody, his lawyer Abbe Lowell said. On social media Friday, Attorney General Pam Bondi said Lemon and three others had been arrested at her direction.

Lemon was present when a group of demonstrators interrupted a Sunday service at Cities Church in St. Paul, Minn., targeting a pastor who they said works for Immigration and Customs Enforcement. Protesters that day shouted "ICE out!" as well as chants calling for justice for Renee Good, the 37-year-old woman who was fatally shot by an ICE agent in January in Minneapolis.

In a 14-page indictment unsealed Friday, Lemon and eight others were charged with conspiring against the right of religious freedom at a place of worship and interfering with the exercise of the right to worship. The indictment alleged that Lemon joined the protesters at a shopping center for a briefing before heading to the church, where the group mounted what prosecutors called a "takeover-style attack."

Georgia Fort, an independent journalist who was also named in the indictment, was arrested Friday, her attorney Leita Walker said.

Prosecutors highlighted Lemon's comments to his livestream audience that Sunday that kept the protesters' destination secret, quoting him as saying: "We're going to head to the operation. Again, we're not going to give any, any of the information away."

Once inside the church, prosecutors said Lemon and the others "oppressed, threatened and intimidated" the congregants. Prosecutors said Lemon and Fort then approached the pastor and "largely surrounded him," with the former CNN anchor asking him several questions to "promote the operation's message."

Lemon said he was in attendance as an independent journalist, not a participant. "I'm just here photographing, I am not part of the group.... I am a journalist," he said in a video documenting the encounter.

After appearing in court Friday, Lemon said the Justice Department had sent a team of agents to arrest him "for something that I had been doing for the last 30 years, and that is covering the news."

"The First Amendment of the Constitution protects that work for me and for countless other journalists who do what I do. I stand with all of them, and I will not be silent," he said after the hearing. "I look forward to my day in court."

Lemon, who has been released, is scheduled to be arraigned Feb. 9 in Minneapolis, the Justice Department said.

Fort's attorney said she was present at the church demonstration "solely in a journalistic capacity." Fort, an Emmy-award winning independent journalist and vice president of the Minnesota chapter of the National Association of Black Journalists, will be defending herself from these charges, her lawyer said.

The arrests came in the midst of pressure from President Trump to prosecute protesters who have clashed with federal agents conducting a sweeping immigration operation in the Twin Cities.

The Justice Department previously sought charges against several people, including Lemon, over the incident. A magistrate judge had authorized arrest warrants for three people but rejected the evidence against Lemon and others as insufficient.

The Justice Department quickly petitioned a federal appeals court to force the approval of the additional arrest warrants, but was rejected by a three-

judge panel.

Bondi was enraged by the magistrate judge's earlier decision not to sign off on the complaint charging Lemon, and Justice Department officials made clear they would try again.

Justice Department leaders have pledged to prosecute protesters they claim have crossed the line from First Amendment-protected free speech to impeding law enforcement or violating others' rights. In the midst of continuing tensions in the Minneapolis area, they called out Lemon, a longtime antagonist of Trump, and argued his role as a journalist shouldn't protect him from prosecution.

On a podcast after the church demonstration, Assistant Attorney General Harmeet Dhillon said Lemon "went into the facility, and then he began—quote, unquote—'committing journalism,' as if that's sort of a shield from being a part, an embedded part, of a criminal conspiracy."

"It isn't," added Dhillon, the head of the Justice Department's civil-rights division.

Lemon's arrest drew condemnation from Democratic lawmakers and press-freedom advocates, with Senate Minority Leader Chuck Schumer (D., N.Y.) saying the Trump administration was "behaving no differently from the police states and authoritarian regimes across history—they've arrested a journalist for the crime of doing his job."

"The arrest is a dark message to journalists everywhere: If you dare criticize this administration, watch your back," Schumer added.

Earlier in January, the Justice Department separately sent subpoenas to several Democratic officials in Minnesota, including Gov. Tim Walz, as part

of an investigation of whether they obstructed federal immigration enforcement operations in the Twin Cities.

*Appeared in the January 31, 2026, print edition as 'Don Lemon Arrested Over Church Protest in Minnesota'.*

C. Ryan Barber is a reporter in The Wall Street Journal's Washington, D.C. bureau, where he covers the Justice Department and legal affairs. Prior to joining the Journal, Ryan reported on the Justice Department and federal law enforcement for Insider and the National Law Journal....

Sadie Gurman covers the Justice Department and federal law enforcement for The Wall Street Journal, with an emphasis on the intersection of politics and the law. She writes about the Justice Department's leadership and policy priorities ranging from national security matters, enforcement an...

Joseph De Avila is a reporter covering breaking news at The Wall Street Journal.

## Videos

Click for Sound

WSJ Opinion: A Victory for Voting Rights at the Supreme Court

WSJ Opinion: The Supreme Court's 6-3 Ruling Against Racial Gerrymandering

Ex-FBI Chief Comey Charged Over Post Officials Say Threatened Trump

---

## WSJ | Buy Side

Reviews and recommendations, independent of The Wall Street Journal newsroom.



GIFT GUIDES

**The Best Mother's Day Gifts for Every Type of Mom**



AUTO INSURANCE

**Best Car Insurance Companies of 2026**



PERSONAL LOANS

**Best Debt Consolidation Loans**



BANKING

**Best High-Yield Savings Accounts for May 2026: Up to 5.00%**



LIFE INSURANCE

**Best Term Life Insurance Companies of 2026**



FINANCIAL ADVISORS

**6 of the Best Financial Advisor Companies: Well-Known Fiduciary Investment Firms to Consider**

---

## Real Estate Insights

Content provided by realtor.com



Inside Cameron Diaz and Benji Madden's $15 Million Montecito Mansion



Jeff Bezos' Property Portfolio Could Fund the Met Gala 100 Times Over



Daniel Craig and Rachel Weisz Quietly Offload Brooklyn Home for $11.8 Million



Are Blake Lively and Ryan Reynolds Set To Quit the U.S.?



Nikki Glaser Reveals Why She Quit Hollywood To Move Back to Missouri



Inside Princess Eugenie's Very Quaint Kensington Palace Cottage

# Exhibit 22

# *Don Lemon Pleads Not Guilty in Minnesota Church Protest Case*

The broadcast journalist appeared in federal court on Friday with four others charged with disrupting a church service to protest the behavior of immigration agents.

▶ Listen · 3:44 min



**By Ernesto Londoño**
Reporting from St Paul, Minn.

Feb. 13, 2026

Don Lemon, the veteran broadcast journalist, entered a not guilty plea in federal court in St. Paul, Minn., on Friday, two weeks after he was charged with two crimes for attending a protest against immigration agents at a Minnesota church.

Mr. Lemon, 59, appeared before U.S. Magistrate Judge Douglas L. Micko along with four others among nine people who have been charged in the case. All five defendants who appeared in court entered not guilty pleas.

The nine defendants are charged with conspiring to violate religious freedoms at a house of worship, and with injuring, intimidating and interfering with the exercise of religious freedoms at a place of worship.

Mr. Lemon, a former CNN anchor who now works as an independent journalist producing content for a YouTube show, has said he was reporting on the protest at Cities Church in St. Paul on Jan. 18.

“The power and protection of the First Amendment has been the underpinning of my work,” Mr. Lemon told reporters outside of the courthouse. “The First Amendment, the freedom of the press, is the bedrock of our democracy.”

Demonstrators targeted the church because one of its pastors, David Easterwood, is a senior official with U.S. Immigration and Customs Enforcement in the state. Mr. Easterwood was not at the service. A second independent journalist, Georgia Fort, was also charged in the case.

Attorney General Pam Bondi has called Mr. Lemon's conduct unlawful, referring to the demonstration as a "riot" that terrified congregants.

One of Mr. Lemon's lawyers, Abbe Lowell, told Judge Micko that investigators had seized Mr. Lemon's cellphone when they arrested him in Los Angeles late last month. Mr. Lowell expressed concern about how much of the content on the phone would be subject to review by the government. A prosecutor told the judge that investigators would use a filtering system in inspecting the phone's content to exclude material protected by attorney-client privilege.

Hours after the hearing, lawyers for Mr. Lemon and Ms. Fort filed a motion asking the judge to unseal transcripts from the grand jury proceedings that led to their indictment.

Their lawyers — who include two Minnesota-based former federal prosecutors — asserted in the filing that the Department of Justice had handled recent cases in an irregular and politicized manner, which they said raised the possibility that prosecutors misled grand jurors about the law in order to secure indictments against the two journalists.

"Courts in this District have increasingly signaled that the government, under the direction of this Administration, is no longer operating in a manner entitled to any presumption of regularity," the lawyers said in the motion. The motion notes that the government intends to oppose it.

When prosecutors first attempted to arrest Mr. Lemon and Ms. Fort last month, Judge Micko declined to sign arrest warrants, having determined there was insufficient probable cause that they broke the law.

Late last month, a federal grand jury indicted Mr. Lemon, Ms. Fort, and seven other individuals who attended the demonstration.

The defendants who appeared in court Friday included Nekima Levy Armstrong, a local activist and civil rights lawyer, and Chauntyll Allen, a St. Paul school board member. The two made speeches to a throng of protesters who gathered outside the courtroom chanting, "protect free speech" and "abolish ICE now."

Ms. Levy Armstrong, who was among the organizers of the demonstration, called on the government to dismiss the charges.

"We have the federal government weaponizing the Department of Justice in order to silence us," she said.

**Ernesto Londoño** is a Times reporter based in Minnesota, covering news in the Midwest and drug use and counternarcotics policy. He welcomes tips and can be reached at elondono.81 on Signal.

# Exhibit 23

The Washington Times
America's Newspaper

Subscribe Sign in

News Policy Commentary Sports Sponsored Events Video/Podcasts Games

Get today's top stories in under five minutes
Listen to the Front Page Podcast

Breaking ground: A 4,500-seat UFC octagon is coming to the White House South Lawn

WATCH: The U.S. Navy's plan to deter China and dominate the seas
Adm. Daryl Caudle with Guy Taylor

TRENDING: DONALD TRUMP | NEW YORK | STRAIT OF HORMUZ | JOEL EMBIID | GERMANY | IRAN | ISRAEL | N.A.S.A. | COLORADO ROCKIES | UNITED ARAB EMIRATES

Advertisement

HOME \ NEWS \ POLITICS

# Justice Dept. charges 30 more people over anti-ICE protest at Minnesota church




*Cities Church is seen in St. Paul, Minn. where activists shut down a service claiming the pastor was also working as an ICE agent, Monday, Jan. 19, 2026 in St. Paul, Minn. (AP Photo/Angelina Katsanis) **FILE***
more ›

Follow Us

Search

SEE MORE VIDEOS

Print

Add us as a preferred source on Google

Advertisement

By Mary McCue Bell · *The Washington Times* · *Friday, February 27, 2026*

Attorney General Pam Bondi said the Justice Department is charging 30 additional people in connection with a January anti-Immigration and Customs Enforcement protest at Cities Church in Minnesota.

The department unsealed the indictment Friday in the U.S. District Court for the District of Minnesota, in which 25 of the 30 have been arrested, with more to come, Ms. Bondi said.

The original nine defendants in the criminal civil rights case, which includes former CNN anchor Don Lemon, have pleaded not guilty.

You Might Also Like



PAID

Honey: The Greatest Enemy of Memory Loss (See How to Use It)
Memory Loss Begins When a Person Eats This Breakfast Food - Do You Eat It?



PAID

Ask a Pro: "How Long Does $1.5M Last in Retirement?"
This quiz matches nearly 50,000 people each month with vetted financial advisors.

It accuses the 39 defendants of partaking in a "coordinated takeover-style attack" and engaging in "acts of oppression, intimidation, threats, interference, and physical obstruction."

Because of the protest, the pastor, allegedly an ICE officer, and the congregation were "forced to terminate the church's worship service, congregants fled the church building out of fear for their safety, other congregants took steps to implement an emergency plan, and young children were left to wonder, as one child put it, if their parents were going to die," the indictment says.

The defendants are being charged under a federal law that prohibits interfering with or intimidating people exercising their religious rights in a house of worship. First-time offenders can face a prison sentence of up to a year and up to a $10,000 fine.

RECOMMENDED

3 family members indicted after protest clash with Turning Point USA journalist in Minnesota

A look at investigations into federal officers months after immigration crackdown in Minnesota

Minnesota prosecutor charges

"YOU CANNOT ATTACK A HOUSE OF WORSHIP. If you do so, you cannot hide from us — we will find you, arrest you, and prosecute you. This Department of Justice STANDS for Christians and all Americans of faith," Ms. Bondi said on social media.

**MY TIMES** VIEW ALL

Georgia woman removed from Delta flight for refusing to get off the phone

COMMENTARY Who is Tucker Carlson to call the church a mess?

Joe Rogan defends Jimmy Kimmel's joke about first lady Melania Trump

Demonstrators entered the Cities Church in Minneapolis on Jan. 18 amid rising tensions over the Trump administration's immigration enforcement tactics in Minneapolis that killed two U.S. citizens.

ADVERTISEMENT

Minnesota prosecutor charges ICE officer with assault after confrontation on highway

Judge orders ICE to let clergy minister to migrants in detention in Chicago area facility

Terror suspect's family flown back to Colorado after judge blocks deportation

One member of the congregation filed a federal lawsuit alleging that the group unlawfully disrupted a service last month as part of a coordinated political demonstration.

The lawsuit accuses eight people, including Mr. Lemon, of civil conspiracy, aiding and abetting, intentional infliction of emotional distress, interference with religious exercise and trespassing.

The director of litigation for True North Legal, the firm representing Cities Church, said that the indictment "sends a clear message: houses of worship are off limits for those who would use chaos and intimidation to advance a political agenda."

"The invasion of Cities Church was a planned, coordinated effort to disrupt a worship service and interfere with religious exercise that placed congregants, including children, in fear for their lives," said Doug Wardlow, director of litigation, in a statement. "The First Amendment does not give anyone —regardless of profession, prominence, or politics—license to storm a church and intimidate, threaten, and terrorize families and children worshipping inside."

Mr. Lemon seemingly asked Cities Church's lead pastor, Jonathan Parnel, for his reaction to the crowd interrupting the service in his livestream of the protest.

ADVERTISEMENT

FRONT PAGE PODCAST

Monday, May 4, 2026

00:00:00

"This is unacceptable, it's shameful. It's shameful to interrupt a public gathering of Christians in worship," the pastor said. "I have to take care of my flock."

*• Mary McCue Bell can be reached at mbell@washingtontimes.com.*

Copyright © 2026 The Washington Times, LLC. Click here for reprint permission.

Please read our comment policy before commenting.

**Comments** 5 Newest

Sign up Log in

Join the conversation...

Aa Log in and post

**FROD** Hall of Famer

Everyone of the invaders in the church should receive stiff fines and probation. I suggest fines in the range of 5-10 thousand dollars or 90 days in Jail... their choice. That should serve as a deterrent to future "peaceful" protesters.

Reply 1 65 days ago

Show more replies

**JamesEB** Legend

Donnie boy brought the lemon. Trump 47's DOJ is making lemonaide. Squeeze that lemon for all its worth!

Reply 1 2 65 days ago

Load more comments

COMMENTARY



**Everett Piper**

Who is Tucker Carlson to call the church a mess?



**Don Feder**

Cole Tomas Allen and the nature of evil



**Robert Knight**

Progressives do not really believe in freedom

VIEW ALL

PODCASTS



Get today's top stories in under five minutes

Listen to the Front Page Podcast



LISTEN: How China's IP theft machine really works

Powered by COOL

Terms | Privacy | Help | Contact COOL Media

## Popular in the community



88 57

**Hegseth calls House Democrats the biggest obstacle facing U.S. in Iran**



78 172

**Hegseth pulls 5,000 U.S. troops from Germany amid Trump tiff with chancellor**



35 126

**U.S. press freedom reaches new low, says global journalism organization**



35 19

**Task force finds Biden administration persecuted traditional...**



34 21

**Who will blink? Iran war alters oil, arms, allies in Gulf region**

CURATED FOR YOU

## MY TIMES

VIEW ALL →

2 young people arrested in alleged plot to attack Houston synagogue members

2 young people arrested in alleged plot to attack Houston synagogue members

Judge blocks ICE from deporting firebombing suspect's wife, kids after agents rearrest them

Judge blocks ICE from deporting firebombing suspect's wife, kids after agents rearrest them

Inside job: For Uncle Sam, the fraud is coming from government employees

Inside job: For Uncle Sam, the fraud is coming from government employees

Who will blink? Iran war alters oil, arms, allies in Gulf region

Who will blink? Iran war alters oil, arms, allies in Gulf region

Appeals court defends ICE in suppressing Portland riots; says sanctuary laws forced agency to act

Appeals court defends ICE in suppressing Portland riots; says sanctuary laws forced agency to act

SPLC raked in donations after Unite the Right rally allegedly facilitated by its paid informant

SPLC raked in donations after Unite the Right rally allegedly facilitated by its paid informant

Newsom's illegal-alien funding spree

Newsom's illegal-alien funding spree

'Sounds pretty gruesome': Rep. Brandon Gill quizzes pro-choice witness about abortion

'Sounds pretty gruesome': Rep. Brandon Gill quizzes pro-choice witness about abortion procedures

Progressivism's attack dog SPLC blows itself up

Progressivism's attack dog SPLC blows itself up

Federal judge orders release of family of man charged in Colorado firebomb attack

Federal judge orders release of family of man charged in Colorado firebomb attack

The federal government made at least $186 billion in improper payments in a

The federal government made at least $186 billion in improper payments in a single year



**WATCH: Justice Alito, a powerhouse of influence**

Mollie Hemingway joins Cheryl Chumley

VIEW ALL

STORY TOPICS

LAW CRIME CITIES CHURCH

single year

Rudy Giuliani hospitalized in critical condition

Rudy Giuliani hospitalized in critical condition

Hegseth returns fire after being scolded for saying 'boys in bombers'

Hegseth returns fire after being scolded for saying 'boys in bombers'

If Iran war forces pivot from the Mideast to U.S. oil, all consumers will pay — including

EXCLUSIVE

If Iran war forces pivot from the Mideast to U.S. oil, all consumers will pay – including Americans

**You Might Also Like**


Ask a Pro: "How Long Does $1.5M Last in...
This quiz matches nearly 50,000 peopl...
Paid | SmartAsset



Honey: The Greatest Enemy of Memory Loss...
Memory Loss Begins When a Person...
Paid | wisetio.com



Not Ozempic! These Are The Best GLP-1...
Beyond Ozempic: compare 2026's...
Paid | Forbes



Dermatologist: The 1 Vitamin You Need If Yo...
Paid | Anti-Aging Research Center





How Could a Family Trust Help Protect Your Estate in 2026?
A family trust may be able to help preserve and pass on your wealth.
Paid | SmartAsset.com



Cardiologist Reveals: "Americans Were Lied To About Egg Yolks"
Paid | Gundry MD



Windows Users Didn't Know This Simple Trick To Block All Ads (Do It Now)
Removing ads is the first step in having a faster, safer and hassle-free browsing experience!
Paid | Safe Tech Tips



Stop Wasting Groceries: The Fridge Mistake Most Households Make
Paid | Consumer Check




Supreme Court allows abortion pill by mail to continue — for now
The Washington Times



U.S. senator's son faces new charges in crash that killed sheriff's deputy
The Washington Times







After 60, Leg Strength Comes From One Simple Daily Move

Paid | primenutritionfindings.com



Cardiologist: Strange "Jelly" Burns Fat...

**( Try It Tonight )**

Paid | special offer health



This Surprising Home Trick Helps Eliminate Toenail Fungus in Days!

Paid | consumersverdict.co



The 5 Expenses Draining Your Wallet (Most People Don't Realize #3)

**Here are the worst culprits for overspending**

Paid | Betterbuck

Advertisement

# Exhibit 24

**Support the Guardian** Support us →
Fund the free press with $5 per month

Print subscriptions Newsletters Sign in

US ·
The Guardian



**Trump's retribution**
Minnesota

# A journalist filmed an ICE protest at a Minnesota church. Then federal agents showed up at her door

After Georgia Fort and Don Lemon reported from a church whose pastor reportedly works for ICE, agents arrested Fort in front of her children

**Rachel Leingang** *in St Paul, Minnesota*
Thu 16 Apr 2026 06.00 EDT

Share

Prefer the Guardian on Google



Georgia Fort. Photograph: Sheldon Powell

When federal agents arrived at Georgia Fort's front door to arrest her, she knew what to do: be a journalist.

Fort, an independent Minnesota reporter who faces criminal charges after covering a protest inside a St Paul church, took out her phone and spoke directly to the camera, livestreaming to her audience that her lawyer advised her to go with the agents. Her three kids were in the house at the time, she said.

"I'm going to have to hop off here and surrender to agents," she said in the video on 30 January. "As a member of the press, I filmed the church protest a few weeks ago, and now I'm being arrested for that. It's hard to understand how we have a constitution, constitutional rights, when you can just be arrested for being a member of the press."

Fort was one of two journalists, alongside Don Lemon, charged for covering the 18 January protest during services at St Paul's Cities church, where a pastor reportedly works as a field director for Immigration and Customs Enforcement.

"I decided to go live [during my arrest] because I felt like it was necessary to be able to tell my story about who I am and my longstanding commitment to journalism," she said, "and to alert the public that this was a violation of my first amendment rights."

The two Black, independent journalists, and the protesters, were charged with unusual violations of law. Charging journalists is in general unusual. Trump has long cast the media as a foe and, during his second administration, has ramped up attacks on the press as part of his campaign of retribution.

During the height of "Operation Metro Surge" in January, days after a federal agent killed Renee Good, dozens of people entered the church to call attention to one of its pastors, who reportedly served as an acting field director of Immigration and Customs Enforcement.

Nearly 40 people have been charged over the protest in a sprawling case that pits the first amendment rights to protest and report against the free exercise of religion. The Trump administration has made clear that the case is a high priority. Harmeet Dhillon, the head of the civil rights division at the Department of Justice, has said the government is "going to pursue this to the ends of the earth", which the government said in legal filings was not a

**Most viewed**

Cruise ship at centre of suspected hantavirus outbreak blocked from docking in Cape Verde

'Point of no return': New Orleans relocation must start now due to sea level, study finds

Is it true that … your lungs regenerate when you quit smoking?

'It's a world heritage site, but it's my home': a long-time resident of Casa Milà on life in Gaudí's masterwork

Live
Middle East crisis live: US denies report that warship trying to pass through strait of Hormuz was hit by Iran

political statement but "mere promises to vigorously enforce federal criminal law".

Fort, 38, has worked as a journalist for nearly two decades and has been independent for roughly the last eight years, producing her own award-winning television show on a local Twin Cities station. She shares her reporting with her online audience of nearly 160,000 followers on Facebook and more than 130,000 on Instagram, and she's highly involved in the journalism community, working to train the next generation of reporters.

She has seen her work affected by the charges. She's entangled with a host of local sources as co-defendants in a case she would ordinarily be covering as a journalist, especially as one who focuses on constitutional rights and amplifying underrepresented voices.

"It's a slap in the face to be prosecuted in the same courts in which I've been credentialed as a member of the press," she said.

In 2020, she saw the CNN journalist Omar Jimenez arrested live on television by Minnesota state patrol. If that could happen to a CNN reporter live on TV, it could easily happen to an independent journalist, she said.

"I think that if your reporting upholds the status quo, no, you probably won't be targeted," she said. "But if you're a journalist like me who is committed to exposing the truth and documenting injustices, yeah, it probably will make you more of a target under this administration."

The government has charged the Minnesota protesters with a violation of the Freedom of Access to Clinic Entrances Act of 1994 (Face Act), a law used to charge people who vandalize a reproductive healthcare clinic, or who threaten, obstruct or injure someone who is trying to access that clinic. The law includes a previously unused provision that prohibits interfering with the exercise of religious freedom at a place of worship. While the administration has brought the charges under that portion, it has virtually stopped prosecuting under the provisions that prevent intimidation at reproductive care clinics and accused the Biden administration of weaponizing the act. Trump has also pardoned nearly two dozen anti-abortion activists convicted of violating the clinic access provision.

The protesters face a second charge of conspiracy to deprive others of rights, a law originally created during the Reconstruction era to protect Black southerners from the Ku Klux Klan.

These types of charges against journalists are "unprecedented", said Gabe Rottman, vice-president of policy at the Reporters Committee for Freedom of the Press. In the rare instance where a journalist is charged, it's typically for trespassing, and those charges are often dismissed, he said.

"It's another escalation on the part of the second Trump administration," he said. "It's exceedingly rare, so much so that it hasn't happened before. These particular statutes haven't been used to charge a journalist."

The journalists will have strong defenses in this case, Rottman said. Prosecutors would need to prove that the journalists acted with an intent to deprive people of their rights, he said.

Using these laws "is a really dramatic overcharge", he said.

## The Cities church protest

After a federal agent shot and killed Renee Good in the streets of Minneapolis on 7 January, Fort worked every day for up to 18 hours a day.

She had been covering immigration agents' raids in the Twin Cities well before the surge. She covers stories of importance to Black and brown communities, she said, and violations of civil, constitutional and human rights. When George Floyd was killed by a police officer in 2020, she reported on the uprisings and aftermath extensively.

The day of the church protest was no different: "I woke up to document what was happening in community."

Video shows a few dozen protesters entering Cities church on 18 January, disrupting a service. They chant "ICE out" and stand in the aisles. In Fort's video about the protest, organizer Nekima Levy Armstrong holds a microphone and explains why they're at the church: one of the pastors is an acting field director at ICE.

"How dare you claim to be a pastor of God and you are involved in evil in our community," Armstrong says on the video.

Lemon interviews a pastor inside the church, who says they asked the protesters to leave but they wouldn't.

The government's indictment of the first batch of protesters and the two journalists alleges the congregants feared for their safety. The government claims the interview with the pastor was "an attempt to oppress and intimidate him". The indictment mentions Lemon more than Fort, but claims she interviewed Armstrong in front of a minivan that was preparing to depart the church.

"The indictment itself describes Ms Fort as 'interview[ing]' Ms Armstrong: a quintessential journalistic function," defense lawyers wrote in a filing. "That is confirmed by internal surveillance footage from the church ... in which Ms Fort can be seen capturing the events using a professional-grade camera and microphone and livestreaming Mr Lemon's interview of the Cities church pastor."

"I am a journalist, and I have published all of the footage I captured that day," Fort said. "It speaks for itself."

The church protest was quickly condemned by the right, and Trump administration officials vowed to prosecute. When Armstrong was arrested, White House social media accounts doctored her image to make it appear like she was crying. After a first round of indictments, the government filed dozens more and is now charging 38 people.

A federal judge first refused to charge the journalists, and an appeals court also rejected the charges. The justice department eventually secured a grand jury indictment. Fort and Lemon's lawyers are seeking access to grand jury documents, arguing the irregular approach to get charges could mean the grand jury was misled or misinstructed.

"To date, everything in this case has been irregular. We can assume the grand jury proceedings were too," a filing seeking access to grand jury materials says. "In the United States of America, we do not prosecute journalists for doing their job. That happens in Russia, China, Iran and other

authoritarian regimes. And yet the government sold this unconstitutional mess to the grand jury."

In a response filing, the government said this quest to bring charges wasn't "improper", but an attempt to prevent copycat crimes.

"The Government was trying to protect the First Amendment rights of all people to worship freely in their houses of worship and avoid violence and injuries happening at houses of worship across the country," the filing says.

In a video analyzing the church protest before she was arrested, Fort asked how Lemon became the story. Maybe, she said, it was to "divert attention" from the focus of the protest: David Easterwood, the pastor who apparently worked for ICE.

"It's become more about the charges and less about the reason why community was there in the first place," she said.

## A journalist muzzled

While the case lingers, Fort's ability to do her job is compromised. The effects on her family weigh heavily on her, and she fears what will happen if she's convicted. The charges carry potential for prison time, though the sentence could vary widely.

"It's one day at a time. It's a lot," she said. "For the most part, I'm good, but I have worked really hard to provide a good life for my kids, and my daughters mean the world to me. And so the thought of that being taken away, it crushes me, just the thought of it."

Her daughters - aged 17, eight and seven - are still dealing with the aftermath of her arrest. They were terrified when agents banged on the door and stayed outside their home for hours after her arrest, she said. Her eldest drove the two younger girls to their aunt's house with her husband in a car behind them. Agents stopped them coming out of the driveway to ask whether they had their mother's laptop or cellphone.

"My eight-year-old talks about ICE every single day. My oldest daughter has had nightmares, and my youngest daughter, she doesn't quite understand, but she does see the way that it's affected everybody, and so you can see now how it's starting to affect her as well," she said. "It's disrupted their sense of security. And I think it's going to take a really long time for our family to heal."

She doesn't understand why the agents couldn't wait until her children had left for school or why two dozen agents were needed to arrest a journalist at her home.

Her eldest daughter spoke publicly at a press conference after Fort's arrest, telling reporters that her mother was doing her job.

"She is not a protester. She is not an activist. She is a mom working to provide for her children through the only way she knows how, documenting and sharing stories of the community and truth of what's happening here every day in our state," her daughter said then.

Covering the case carries ethical and legal concerns, Fort said. Anything she reports on it could be used against her in the case. She has produced some videos about the case, but not to the extent she normally would cover it as a reporter. Charging her is an attempt to "muzzle" her and her reporting, she said.

When she's received tips about other actions where there could be civil disobedience, she has refrained from going to report.

"There's things I'm not covering right now because it's too dangerous," she said. "And as much as I do want to serve my community and make sure they're informed and make sure that there is an accurate document of what's happening, I also want to be with my kids just as much, if not more. I want to be able to see my daughter's birthday. So my risk tolerance is zero these days."

Fort often highlights attacks on journalists in her coverage, and she brings up the sustained attack on press freedom globally as context for her arrest. She points to journalists like Mario Guevara, a Latino journalist in Georgia who was deported by the Trump administration, and the hundreds of journalists killed in Gaza.

These attacks on journalists aren't just personal - they are an attack on the public's right to know, she said.

"Why would anybody not want you to know truth and facts?" she said. "Why would someone want to arrest and criminalize the people whose job it is to simply keep you informed?"

Explore more on these topics

Minnesota | Trump's retribution | US constitution and civil liberties | Trump administration | ICE (US Immigration and Customs Enforcement) | US justice system | Journalism, publishing and public relations | Law (US) | Features

Share

Reuse this content

- Far fewer asks for support
- Ad-free reading on all your devices
- Unlimited access to the premium Guardian app
- Regular dispatches from the newsroom to see the impact of your support
- Unlimited access to Feast, the Guardian recipe app

Support once from just $1

Continue → Remind me in June VISA

Explore more on these topics

Minnesota | Trump's retribution | US constitution and civil liberties | Trump administration | ICE (US Immigration and Customs Enforcement) | US justice system | Journalism, publishing and public relations | Law (US) | features

Share

Report this content

**Trump's retribution**

Judge blocks White House bid to revoke whistleblower lawyer's security clearance

13 Jan 2026



Congress member who faces charges for visiting ICE facility says Trump is 'using me as an example'

17 Dec 2025



Trump's retribution campaign: who has the president targeted so far besides John Bolton?

17 Oct 2025



The Democratic superlawyer Trump can't silence: 'We are in the break-glass moment of American history'

24 Sept 2025



Ice t… orga… work… Mexi…

23 Sept



**More from News**

Middle East crisis live
US denies report that warship trying to pass through strait of

US politics live
US supreme court temporarily restores access to abortion pills

Pope Leo
Marco Rubio to meet pope this week after Trump's broadside

New Orleans
'Point of no return': New Orleans relocation must start now due to

Europ…
Euro… to an… brut…

# Exhibit 25

Transparency Report Help

- Safe Browsing FAQs
- Email Encryption FAQs
- HTTPS FAQs
- Android Ecosystem Security FAQs
- Requests for User Information FAQs

# Requests for User Information FAQs

## Requests for User Information

### How does Google handle government requests for user information?

A variety of laws allow government agencies around the world to request the disclosure of user information for civil, administrative, criminal, and national security purposes. Google carefully reviews each request to make sure it satisfies applicable laws. If a request asks for too much information, we try to narrow it, and in some cases we object to producing any information at all. For more information, see our policies for how Google handles government requests for user information.

### If Google receives a request for user information, will Google tell the account holder about it?

The laws governing when a provider, like Google, can notify the account holder vary by jurisdiction. For more information, see our policies for notifying users in how Google handles government requests for user information.

When we notify the account holder about a legal request, we do so by email. In these emails, Google will not ask for any personal information such as a password or social security number. If you get an email purportedly from Google that asks for this type of information, don't provide it. The email is probably a scam, so please report it to us.

### Does Google give governments direct access to user information?

No, we require that requests for user information be sent to Google directly and not through any sort of "back door" direct access by the government. Our legal team reviews each and every request, and we have taken the lead in being as transparent as possible about government requests for user information. For more information, see our policies for how Google handles government requests for user information.

### Does Google sell personal information to governments?

No, we do not sell personal information to anyone, including government agencies. We remain committed to protecting our users against any improper demands for their personal information and we will continue to oppose demands that are overly broad or otherwise legally objectionable.

For more information, see Google's policy on handling government requests for user information.

### How can government agencies send legal requests to Google?

Google provides an online system that allows verified government agencies to securely submit requests for user information, view the status of requests submitted, and, ultimately, download Google's response.

### What if I want to give a government agency information from my Google Account?

You can use Google Takeout to create an archived file of your content from most Google services, and you can choose to share that content with whomever you like. Google, however, requires valid legal process before we'll produce information in response to a request from a government agency (even if the request is being made on your behalf), absent an emergency situation.

### What kinds of information do you disclose for different products?

To answer that, let's look at four services from which government agencies commonly request information: Gmail, YouTube, Google Voice, and Blogger. Here are examples of the types of information we may be compelled to disclose, depending on the cited legal authority, the scope of the request, and what is requested and available. If we believe a request is overly broad, we will seek to narrow it.

| Products | Subscriber Information | Non-Content Transactional Information | Content Information |
|---|---|---|---|
| **Gmail** | • Subscriber registration information (e.g. name, account creation information, associated email addresses, phone number)<br>• Sign-in IP addresses and associated time stamps | Non-content information (such as non-content email header information) | Email content |
| **YouTube** | • Subscriber registration information<br>• Sign-in IP addresses and associated time stamps | Video upload IP address and associated time stamp | • Copy of a private video and associated video information<br>• Private message content |
| **Google Voice** | • Subscriber registration information<br>• Sign-up IP address and associated time stamp<br>• Telephone connection records<br>• Billing information | Forwarding number | • Stored text message content<br>• Stored voicemail content |
| **Blogger** | • Blog registration page<br>• Blog owner subscriber information | • IP address and associated time stamp related to a specified blog post | Private blog post and comment content |

| | | | |
|---|---|---|---|
| | | • IP address and associated time stamp related to a specified post comment | |

Does Google respond to abortion-related legal requests?

Google carefully reviews every legal request to ensure it satisfies applicable laws, and we have a long track record of pushing back against overbroad or otherwise inappropriate government demands for user data, including objecting to some demands entirely. In addition, consistent with California AB 1242, Google asks U.S. state law enforcement officials to attest that their requests for user data do not pertain to certain abortion-related investigations as set forth in that law.

## Transparency Report on Requests for User Information

What is a government request for user information?

A government request for user information is when a government agency asks Google to disclose information about someone who uses Google services. Most requests are issued in the context of criminal investigations, but government agencies may also request information in the context of civil or administrative cases. In this report, we are revealing statistics about those demands.

What is an emergency disclosure request?

Where a person may be in serious physical danger, a government agency may ask Google to voluntarily disclose information needed to prevent the emergency. For more information, see our policies on how Google handles government requests for user information.

What is a preservation request, and are preservation requests included in the total number of requests?

A government agency may ask Google to set aside a copy of specific information while the agency applies for legal process to compel the disclosure of that information. Preservation requests only apply to information that Google has at the time of the request, not information that may be generated in the future.

We report the number of preservation requests received, but we do not include preservation requests in the total number of user data disclosures because we don't disclose any user information in response to a preservation request. If a government agency does come back with a legal order to disclose preserved information, we account for those disclosures in the appropriate legal process category.

Is the data that you show in your Transparency Report comprehensive?

Our goal is to present a comprehensive data set encompassing all demands we receive from government agencies for user information. The global report includes all categories of government requests from all countries that we have processed or completed at the time of the report's publication, except for requests issued under US national security laws, which are detailed separately. We can't guarantee that the data will always be error-free, but we're continuously working to improve our internal processes and to correct or update our data so our reports are timely and accurate.

For the reporting period July 2020 through December 2020, we excluded matters that we received, but were withdrawn due to COVID-19 prior to being processed.

Why do some of the older reporting periods have less data than newer reporting periods?

We keep looking for new ways to show more information and interesting insights, and early time periods may not include this new information. For example:

- Starting with July - December 2010, we began to disclose the percentages of user information requests for which we produce at least some information
- Starting with January - June 2011, we began to disclose the number of users or accounts about which information was requested

Is the number of "accounts" a comprehensive count of the total number of users implicated by government requests for user information?

The column for the number of "accounts" attempts to reflect the number of accounts that were subject to a government request for user information. This number is not necessarily an aggregate count of unique users for several reasons. For example, the same Gmail account may be specified in several different requests for user information, perhaps once in a subpoena and then later in a search warrant. We add both instances to the "accounts" total even though it's the same account. Similarly, we might receive a request for an account that doesn't exist at all. In that case, we would still add both the request and the non-existent account to the totals. We may also receive a request that has multiple identifiers (for example, multiple YouTube video URLs) that resolve to the same user account. We've taken efforts to reduce over-inclusiveness, but have decided that it is better to err on the side of a greater number.

There are also instances where we do not include accounts in the number, such as when the information that we disclose is anonymized or aggregated or when accounts are not specifically identified by a request but are based on other criteria in the request.

How do you calculate the percentage of requests where some information was produced?

Even if we objected to a request in part, if we produced any user information in response to a government request, that request gets reflected in this percentage. If we didn't produce any information at all, either because we objected to the request in full or because there was no responsive user information to produce, that request doesn't get included in the percentage.

What is a mutual legal assistance treaty (MLAT)?

An MLAT is a treaty between two or more countries that defines how each will help in legal matters such as criminal investigations. Through an MLAT, the government of one country can ask the government of another country for assistance in getting information from

companies in the other country.

Give feedback about this article

©2026 Google · Privacy Policy · Terms of Service

Language

English

# Exhibit 26

# It's time for more transparency around government data demands

Jun 23, 2022 · 2 min read

Kent Walker
President of Global Affairs, Google & Alphabet

Share

Listen to article 3 minutes

As our lives continue to become more digitized, laws governing government access to personal information need to evolve to protect both public safety and civil liberties.

America's Stored Communications Act, passed in 1986 (before the internet became a part of daily life), sets the rules governing government demands to providers to disclose information about their users. One of those rules lets the government seek orders to prevent providers like Google from telling users about demands for data. These so-called Non-Disclosure Orders (NDOs) or "gag orders" have become commonplace.

We're seeing NDOs issued for an increasing number of court orders, warrants, and subpoenas from U.S. authorities. That means that providers can't notify users until long after compliance, if ever. And that people don't have the opportunity to go to court to contest disclosure orders.

We've seen NDOs issued in cases where the user is already aware of the investigation, and even of the legal demand itself. Similarly, we've seen NDOs issued covering legal requests for the data of well-established reputable organizations, even though notifying the organization is highly unlikely to do harm. And we've seen some NDOs that might have been initially justified lasting years beyond the investigation, in some cases indefinitely.

It's time to reform this practice, requiring more robust review before gag orders are issued.

We commend the bipartisan House passage of the NDO Fairness Act, a bill sponsored by Chairman Nadler and Representative Fitzgerald that would make much-needed improvements to the Stored Communications Act. This reform will ensure that gag orders are issued only where warranted and for reasonable periods.

This position is nothing new for us. We've long advocated for transparency for both our users and the public. We were the first major company to publish a Transparency Report on government requests for user data and co-founded both the Global Network Initiative and the Reform Government Surveillance coalition. We've long supported surveillance reform, including the Email Privacy Act, and legislation to allow providers to be more open about national security requests. We also contest inappropriate gag orders, going to court where necessary (with one case leading the U.S. Department of Justice to pledge to stop using court orders to get journalists' information in leak investigations). We've also built industry-leading products to give business customers transparency and control over who has access to their data.

Transparency for government data demands is an important check-and-balance, and we urge both the House and Senate to advance this practical protection for Americans in the digital age.

POSTED IN: Public Policy

## Related stories

Google Meta Microsoft SNAPCHAT

GOOGLE IN EUROPE

Reaffirming our commitment to child safety in the face of European Union...



SAFETY & SECURITY

Evolving expectations of what's possible

Google LinkedIn SNAPCH Microsoft TikTok Met

PUBLIC POLICY

EU lawmakers must act now to ensure the continued protection of children

Apr 04, 2026 → By Kent Walker · Mar 30, 2026 → Mar 19, 2026

Follow Us

Google Privacy Terms About Google Google Products About the Keyword

Help Global (English)

Let's stay in touch. Get the latest news from Google in your inbox.

Subscribe No thanks

# Exhibit 27

# *U.S. Waged Secret Legal Battle to Obtain Emails of 4 Times Reporters*

The push began in the Trump administration and continued under President Biden, and the Justice Department obtained a gag order to keep it from public view.

 

**By Charlie Savage and Katie Benner**

Published June 4, 2021 Updated June 9, 2021

WASHINGTON — In the last weeks of the Trump administration and continuing under President Biden, the Justice Department fought a secret legal battle to obtain the email logs of four New York Times reporters in a hunt for their sources, a top lawyer for the newspaper said Friday night.

While the Trump administration never informed The Times about the effort, the Biden administration continued waging the fight this year, telling a handful of top Times executives about it but imposing a gag order to shield it from public view, said the lawyer, David McCraw, who called the move unprecedented.

The gag order prevented the executives from disclosing the government's efforts to seize the records even to the executive editor, Dean Baquet, and other newsroom leaders.

Mr. McCraw said Friday that a federal court had lifted the order, which had been in effect since March 3, freeing him to reveal what had happened. The battle was over an ultimately unsuccessful effort by the Justice Department to seize email logs from Google, which operates The Times's email system, and which had resisted the effort to obtain the information.

The disclosure came two days after the Biden Justice Department notified the four reporters that the Trump administration, hunting for their sources, had in 2020 secretly seized months of their phone records from early 2017. That notification followed similar disclosures in recent weeks about seizing communications records of reporters at The Washington Post and CNN.

Mr. Baquet condemned both the Trump and Biden administrations for their actions, portraying the effort as an assault on the First Amendment.

"Clearly, Google did the right thing, but it should never have come to this," Mr. Baquet said. "The Justice Department relentlessly pursued the identity of sources for coverage that was clearly in the public interest in the final 15 days of the Trump administration. And the Biden administration continued to pursue it. As I said before, it profoundly undermines press freedom."

There was no precedent, Mr. McCraw said, for the government to impose a gag order on New York Times personnel as part of a leak investigation. He also said the government had never before seized The Times's phone records without advance notification of the effort.

A Google spokeswoman said that while it does not comment on specific cases, the company was "firmly committed to protecting our customers' data and we have a long history of pushing to notify our customers about any legal requests."

Anthony Coley, a Justice Department spokesman, noted that "on multiple occasions in recent months," the Biden-era department had moved to delay enforcement of the order and it then "voluntarily moved to withdraw the order before any records were produced."

He added: "The department strongly values a free and independent press, and is committed to upholding the First Amendment."

Last month, Mr. Biden said he would not permit the Justice Department during his administration to seize communications logs that could reveal reporters' sources, calling the practice "simply, simply wrong." (Under the Obama administration, the Justice Department had gone after such data in several leak investigations.)

On Saturday, Jen Psaki, the White House press secretary, released a statement reiterating the president's policy and distancing the White House from the department's effort to obtain email data from Times reporters.

"As appropriate given the independence of the Justice Department in specific criminal cases, no one at the White House was aware of the gag order until Friday night," Ms. Psaki said.

In a separate statement on Saturday, the Justice Department said it had updated its policy involving reporters' records.

The letter this week disclosing the seizure of phone records involving the Times reporters — Matt Apuzzo, Adam Goldman, Eric Lichtblau and Michael S. Schmidt — had hinted at the existence of the separate fight over data that would show whom they had been in contact with over email.

The letters said the government had also acquired a court order to seize logs of their emails, but "no records were obtained," providing no further details. But with the lifting of the gag order, Mr. McCraw said he had been freed to explain what had happened.

Prosecutors in the office of the United States attorney in Washington had obtained a sealed court order from a magistrate judge on Jan. 5 requiring Google to secretly turn over the information. But Google resisted, apparently demanding that The Times be told, as its contract with the company requires.

The Justice Department continued to press the request after the Biden administration took over, but in early March prosecutors relented and asked a judge to permit telling Mr. McCraw. But the disclosure to him came with a nondisclosure order preventing him from talking about it to other people.

Mr. McCraw said it was "stunning" to receive an email from Google telling him what was going on. At first, he said, he did not know who the prosecutor was, and because the matter was sealed, there were no court documents he could access about it.

The next day, Mr. McCraw said, he was told the name of the prosecutor — a career assistant United States attorney in Washington, Tejpal Chawla — and opened negotiations with him. Eventually, Mr. Chawla agreed to ask the judge to modify the gag order so Mr. McCraw could discuss the matter with The Times's general counsel and the company's outside lawyers, and then with two senior Times executives: A.G. Sulzberger, the publisher, and Meredith Kopit Levien, the chief executive.

"We made clear that we intended to go to court to challenge the order if it was not withdrawn," Mr. McCraw said. Then, on June 2, he said, the Justice Department told him it would ask the court to quash the order to Google at the same time that it disclosed the earlier phone records seizure, which he had not known about.

He described the position he was in as "untenable," especially when it came to talking with Times reporters about chatter involving some kind of fight involving Google and a leak investigation related to The Times.

The Justice Department has not said what leak it was investigating, but the identity of the four reporters who were targeted and the date range of the communications sought strongly suggested that it centered on classified information in an April 2017 article about how James B. Comey Jr., the former F.B.I. director, handled politically charged investigations during the 2016 presidential campaign.

The article included discussion of an email or memo by a Democratic operative that Russian hackers had stolen, but that was not among the tranche that intelligence officials say Russia provided to WikiLeaks for public disclosure as part of its hack-and-dump operation to manipulate the election.

The American government found out about the memo, which was said to express confidence that the attorney general at the time, Loretta Lynch, would not let an investigation into Hillary Clinton's use of a private email server go too far. Mr. Comey was said to worry that if Ms. Lynch made and announced the decision not

to charge Ms. Clinton, Russia would put out the memo to make it seem illegitimate, leading to his unorthodox decision to announce that the F.B.I. was recommending against charges in the matter.

The Justice Department under then-President Donald Trump, who fired Mr. Comey and considered him an enemy, sought for years to find evidence sufficient to charge him with the crime of making unauthorized disclosures of classified information — a push that eventually came to focus on whether he had anything to do with The Times's learning about the existence of the document Russian hackers had stolen.

The long-running leak investigation into Mr. Comey was seen inside of the Justice Department as one of the most politicized and contentious, even by the standards of a department that had been prevailed upon in several instances to use leak investigations and other policies concerning book publication to attack former officials who criticized Mr. Trump.

Throughout last year, prosecutors talked about whether or not to close the leak investigation into Mr. Comey, according to two people familiar with the case, in part because there seemed to be little evidence to show that the former F.B.I. director had shared classified information with the press.

Last fall, department officials discussed whether the investigation had run its course and prosecutors should draft a declination memo that would explain why Mr. Comey would not be prosecuted, one of the people said. But the F.B.I. and the career prosecutors working on the case wanted to keep the investigation open, the people said, and in January prosecutors obtained a special court order to require Google to turn over data on the reporters' emails.

With Mr. Trump soon to be out of office, the order was controversial among some inside of the department, according to two people with knowledge of the case. It was seen as unusually aggressive for a case that would likely end in no charges. During the transition from the Trump to the Biden administration, at least one official wrote in a memo that the case should be closed, according to a person familiar with the transition.

In the court filings seeking to compel Google to turn over logs of who was communicating with the four reporters who wrote that story, the Justice Department persuaded the judge that the secrecy was justified because, as the judge wrote on Jan. 5, "there is reason to believe that notification of the existence of this order will seriously jeopardize the ongoing investigation, including by giving targets an opportunity to destroy or tamper with evidence."

The Jan. 5 document does not acknowledge that the existence of the leak investigation into Mr. Comey and its subject matter was by then already known, because The Times had reported on it almost a year earlier. It is not clear whether the Justice Department told the judge about that article, or instead suggested that the inquiry was still a well-kept secret.

**Charlie Savage** is a Washington-based national security and legal policy correspondent. A recipient of the Pulitzer Prize, he previously worked at The Boston Globe and The Miami Herald. His most recent book is "Power Wars: The Relentless Rise of Presidential Authority and Secrecy."

**Katie Benner** covers the Justice Department. She was part of a team that won a Pulitzer Prize in 2018 for public service for reporting on workplace sexual harassment issues.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Justice Dept. Waged Secret Fight To Get Emails of Times Reporters

# Exhibit 28

The New York Times https://www.nytimes.com/2006/01/20/technology/google-resists-us-subpoena-of-search-data.html

# Google Resists U.S. Subpoena of Search Data

**By Katie Hafner and Matt Richtel**

Jan. 20, 2006

SAN FRANCISCO, Jan. 19 - The Justice Department has asked a federal judge to compel Google, the Internet search giant, to turn over records on millions of its users' search queries as part of the government's effort to uphold an online pornography law.

Google has been refusing the request since a subpoena was first issued last August, even as three of its competitors agreed to provide information, according to court documents made public this week. Google asserts that the request is unnecessary, overly broad, would be onerous to comply with, would jeopardize its trade secrets and could expose identifying information about its users.

The dispute with Google comes as the government is moving aggressively on several fronts to obtain data on Internet activity to achieve its law enforcement goals, from domestic security to the prosecution of online crime. Under the antiterrorism law known as the USA Patriot Act, for example, the Justice Department has demanded records on library patrons' Internet use.

Those efforts have encountered resistance on privacy grounds.

The government's move in the Google case, however, is different in its aims. Rather than seeking data on individuals, it says it is trying to establish a profile of Internet use that will help it defend the Child Online Protection Act, a 1998 law that would impose tough criminal penalties on individuals whose Web sites carried material deemed harmful to minors.

The law has faced repeated legal challenges. Two years ago, the Supreme Court upheld an injunction blocking its enforcement, returning the case to a district court for further examination of Internet-filtering technology that might be an alternative in achieving the law's aims.

The government's motion to compel Google's compliance was filed on Wednesday in Federal District Court in San Jose, Calif., near Google's headquarters in Mountain View. The subpoena and the government's motion were reported on Thursday by The San Jose Mercury News.

In addition to records of a week of search queries, which could amount to billions of search terms, the Google subpoena seeks a random list of a million Web addresses in its index.

Charles Miller, a spokesman for the Justice Department, said on Thursday that three Google competitors in Internet search technology -- America Online, Yahoo and MSN, Microsoft's online service -- had complied with subpoenas in the case.

Mr. Miller declined to say exactly how the data would be used, but according to the government's filings, it would help estimate the prevalence of material that could be deemed harmful to minors and the effectiveness of filtering software. Opponents of the pornography law contend that filtering software could protect minors effectively enough to make the law unnecessary.

The government's motion calls for Google to surrender the information within 21 days of court approval.

Although the government has modified its demands since last year, Google said Thursday that it would continue to fight. "Google is not a party to this lawsuit, and their demand for information overreaches," said Nicole Wong, Google's associate general counsel, referring to government lawyers. "We intend to resist their motion vigorously."

Philip B. Stark, a statistics professor at the University of California, Berkeley, who was hired by the Justice Department to analyze search engine data in the case, said in legal documents that search engine data provided crucial insight into

information on the Internet.

"Google is one of the most popular search engines," he wrote in a court document related to the case. Thus, he said, Google's databases of Web addresses and user searches "are directly relevant."

But Danny Sullivan, editor of SearchEngineWatch, an online industry newsletter, questioned the need for a subpoena. "Is this really something the government needs Google to help them with?" he said.

As for Google's rivals, MSN declined to speak directly to the case but released a statement saying it generally "works closely with law enforcement officials."

Mary Osako, a Yahoo spokeswoman, said the company complied with the subpoena "on a limited basis." And Andrew Weinstein, a spokesman for AOL, said that company gave the Justice Department a generic list of anonymous search terms from a one-day period.

Susan P. Crawford, a professor at the Cardozo School of Law in New York, said she could understand why the companies complied. "There's this real perception that if you're not with us you're against us," she said. "So the major companies will cooperate with enormously burdensome requests just to avoid future vengeance being wreaked on them" by the Justice Department.

In its brief history, Google has made "Don't be evil" an operating principle, even as it has come to endure scrutiny and criticism over its increasing inroads into a variety of businesses beyond Web searches, from advertising to mapping.

And Google and its rivals have been criticized for their business practices in China, where Google and MSN have filtered keywords like "human rights" and "democracy" out of their search-engine results. Last fall, it was revealed that Yahoo had cooperated with authorities seeking the identity of a Chinese e-mail subscriber who had distributed a government warning about protests; he is now serving a 10-year prison term.

While its court filings against the Justice Department subpoena have emphasized the burden of compliance and threat to its trade secrets, Google also pointed to a chilling effect on its customers.

"Google's acceding to the request would suggest that it is willing to reveal information about those who use its services," it said in an October letter to the Justice Department. "This is not a perception Google can accept. And one can envision scenarios where queries alone could reveal identifying information about a specific Google user, which is another outcome that Google cannot accept."

For its part, the Justice Department said the data received from Google's rivals showed that the search query information did not contain "any additional personal identifying information" and that trade secrets would be protected under procedures at the trial court.

"Google thus should have no difficulty in complying in the same way as its competitors have," the government's motion said.

Critics of the effort to subpoena Google say the immediate issue is not pornography or privacy, but whether the government has established its need for the information.

"The government's attitude, apparently, is that it's entitled to information without justification," said Aden Fine, an attorney for the American Civil Liberties Union, which has led the fight against the 1998 pornography law. "Like everyone else in litigation, they need to justify their request for information."

Even as the government has yet to put the 1998 law into effect, the pornography industry has faced a legal offensive on other fronts. Congress in recent years has increased the resources and sharpened the laws available to the Justice Department to go after makers of hard-core videos and other content.

At the same time, though, the industry is booming, recording $12.6 billion in revenue in 2005 from distribution of sexually explicit content, and from other forms of entertainment, like strip clubs. A big reason for the growth is technology, with

sales from Internet distribution hitting $2.5 billion in 2005, according to testimony given to the Senate on Thursday.

American Web sites that show explicit content get as many as 60 million visitors a day, according to testimony given to the Senate Committee on Commerce, Science and Transportation by Paul Cambria, general counsel for the Adult Freedom Foundation, an organization that represents the interests of the pornography industry.

In fighting the 1998 law, the civil liberties union has argued that whether or not pornography is available on the Internet, the law is unconstitutional because it will limit the distribution of acceptable forms of free speech. Under the law, Web site operators face criminal charges for publishing sexually explicit material unless they have a way of verifying that viewers are over 17.

Whatever the courts ultimately decide on the pornography law at issue, however, Tim Wu, a professor at Columbia Law School, said the Google case pointed to a larger struggle for the identity of the Internet.

"Search engines are at the center of that battle, both here and in other countries," said Professor Wu. "By asserting its power over search engines, using threats of force, the government can directly affect what the Internet experience is. For while Google is fighting the subpoena, it's clear that if they lose, they will comply."

A version of this article appears in print on , Section A, Page 1 of the National edition with the headline: Google Resists U.S. Subpoena Of Search Data

# Exhibit 29

**U. S. Department of Justice**

Office of the Deputy Attorney General

The Deputy Attorney General

*Washington, D.C. 20530*

May 27, 2022

MEMORANDUM FOR HEADS OF DEPARTMENT LAW ENFORCEMENT COMPONENTS
DEPARTMENT LITIGATING COMPONENTS
DIRECTOR, EXECUTIVE OFFICE FOR U.S. ATTORNEYS
ALL UNITED STATES ATTORNEYS

FROM: THE DEPUTY ATTORNEY GENERAL Lisa Monaco

SUBJECT: Supplemental Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)

This Memorandum provides clarification and direction for Department attorneys regarding protective orders pursuant to 18 U.S.C. § 2705(b) of the Stored Communications Act (SCA).[1] It supplements and clarifies the *Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C § 2705(b)*, issued by Deputy Attorney General Rod J. Rosenstein on October 19, 2017 (hereinafter the *2017 Policy*). New policy or procedures that appear within this Memorandum apply prospectively to all applications seeking Section 2705(b) orders filed on or after 30 days from the date this Memorandum is issued (including an application seeking to extend the period of an existing protective order). Updates to Justice Manual Section 9-13.700 consistent with this Memorandum will be forthcoming.

The SCA authorizes the government to access records maintained by providers of electronic communication service and remote computing services. In the modern era, these provisions provide a critical means for evidence collection and are a common tool in all types of federal criminal investigations. At the same time, the "SCA contains no default sealing or nondisclosure provisions" that would prohibit the subscriber from receiving notice from the provider about the government action. *In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1129 (D.C. Cir. 2020) (internal quotation marks omitted).

[1] This Memorandum is intended only to assist in the management of the Department of Justice and the execution of its responsibilities. It is not intended to and does not create any right, benefit, trust, or responsibility, whether substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, entities, officers, employees, or any person, nor does it create any right of review in an administrative, judicial, or any other proceeding. This Memorandum does not impact or alter existing procedures governing protective orders pursuant to any other authority, including 18 U.S.C. § 2709(c) or the Termination Procedures for National Security Letter Nondisclosure Requirement, Federal Bureau of Investigation (Nov. 24, 2015).

Instead, Section 2705(b) permits the government to seek a court order that temporarily precludes a service provider from notifying another person of the existence of a warrant, subpoena, or court order issued pursuant to the SCA. To obtain such an order, however, the government must establish that there is reason to believe that notification of the existence of the warrant, subpoena, or court order "will"[2] result in (1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of a potential witness; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial.

As noted in the *2017 Policy*, a protective order should be sought only after a prosecutor engages in a case- and fact-specific analysis. For example, protective orders may not be warranted when prosecutors take actions unlikely to alert targets of the investigation. Likewise, as investigations progress or become public, prosecutors should carefully consider whether such orders remain warranted, and, if so, for how long. Prosecutors should not assume that a prior need for a protective order means a subsequent order is necessary. While in many cases, particularly at an early stage of an investigation, one or more of these provisions may apply, case or other developments may reduce the likelihood of adverse results.

A prosecutor must provide a court with sufficient facts to permit the court to conduct the same case- and fact-specific analysis. In particular, as the *2017 Policy* stated, prosecutors applying for a § 2705(b) order must tailor the application to include the available facts that permit "an individualized and meaningful assessment regarding the need for protection from disclosure." Applications should identify which of the pertinent factors apply and explain why.

**<u>Additional Section 2705(b) Orders After an Initial Order of One Year</u>**

The *2017 Policy* directs that prosecutors filing § 2705(b) applications may only seek to delay notice for one year or less, barring exceptional circumstances. Prosecutors may seek a second or additional protective order of equal or shorter duration if factors justifying non-disclosure continue to exist at the expiration of the original order, but requests should be supported with such additional, specific facts as may have been developed through the investigation.

To ensure that all facts and circumstances continue to be considered before applying for a protective order, applications for protective orders must be approved in writing by a supervisor whenever (a) it appears reasonably likely that the target(s) of the investigation already knows of the investigation's existence or (b) the application is for a second or successive period of non-

---

[2] In contrast, a different subsection of 18 U.S.C. § 2705 dealing with the government's more limited notice requirements permits a shorter, 90-day protective order where there is reason to believe that notification "may" have one of the enumerated adverse results. *See* 18 U.S.C. § 2705(a).

disclosure, such that the total period of the protective order exceeds 18 months.[3] In order to maintain records of appropriate approvals, where approval is required, the litigating component making the application should maintain a record of such approval.

All sections and offices must establish a protocol by which they routinely review the need for § 2705(b) orders in an ongoing investigation or case. Such review can be accomplished through an office's regular case review.

The Department recognizes that judges may direct shorter or longer periods for orders, consistent with the language of § 2705(b), and this guidance does not affect those circumstances.

**Closed Investigations and Termination of Section 2705(b) Orders**

When closing an investigation or matter, a prosecutor must immediately assess whether there is a basis to maintain any outstanding protective orders issued pursuant to § 2705(b). If the prosecutor concludes that there is no such basis, the office must terminate the protective order and ensure the service provider is notified of any such termination (and, if necessary, notifying and/or seeking approval from the appropriate court before doing so). If the prosecutor believes there is a compelling reason to maintain a protective order, the prosecutor must seek approval from a supervisor to allow the protective order to remain in effect. Early termination of protective orders is not required for accounts that prosecutors believe were solely used as part of criminal infrastructure (e.g., accounts exclusively used to send malware to victims).

All sections and offices must establish a protocol by which an investigation's or case's outstanding § 2705(b) orders are reviewed as part of a case closing procedure.

**Exceptional Circumstances and Section 2705(b) Protective Orders**

Where there are "exceptional circumstances," the *2017 Policy* permits prosecutors to apply for initial or successive protective orders greater than one year in length. In almost all cases, these exceptional circumstances involve certain national security investigations with a significant foreign nexus, where the investigation differs in significant ways from a traditional criminal investigation.

To assist the Department in monitoring the use of this exception, prosecutors must notify the Department's Criminal Division (CRM) or National Security Division (NSD) when they seek

---

[3] Supervisory approval for a successive protective order is not necessary if one or more target(s) of the investigation remains outside the United States and/or is a current fugitive.

a Section 2705(b) protective order of greater than one year due to "exceptional circumstances."[4] To ensure that the exception continues to be used only where warranted, for orders issued under "exceptional circumstances" for a period of greater than one year, supervisors in the section or office seeking such orders should conduct a review at least annually of such orders in order to confirm that any such unexpired orders remain necessary and notify CRM or NSD, as warranted, of the result of the review.[5] The review should include an assessment of whether there remains a need for those protective orders.

**Other Existing Department Requirements**

All additional existing approval requirements related to the issuance of legal process—such as those governing sensitive investigative matters or legal process involving members of the news media—remains in effect.

Thank you for all you to do to serve the public and your dedication to the rule of law.

[4] For all investigations and cases that otherwise have a Justice Manual notification, consultation, and/or approval requirement to NSD (or one of its Sections), notification of an application for a 2705(b) order should be made to the relevant NSD Section. For all other 2705(b) order applications, notifications should be made to CRM.

[5] If a prosecutor believes a matter that is not a national security investigation with a significant foreign nexus still constitutes exceptional circumstances for purposes of this memorandum, he or she should consult with CRM and NSD before seeking a protective order for greater than one year. Consultation can simultaneously be done for a set of related matters that have a common reason for falling within this exception.